Leigh A. Parker (170565)
lparker@weisslawllp.com
**WEISSLAW LLP**
1516 South Bundy Drive, Suite 309
Los Angeles, CA 90025
Telephone: 310/208-2800
Facsimile:  310/209-2348

*Attorneys for Plaintiff Jeffrey S. L. Cheah*
*and the Proposed Class*

[Additional counsel appear on signature page]

# UNITED STATED DISTRICTCOURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY S. L. CHEAH, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>AFFYMETRIX, INC.,<br>JAMI DOVER NACHTSHEIM,<br>FRANK WITNEY,<br>NELSON C. CHAN,<br>GARY S. GUTHART,<br>RICCARDO PIGLIUCCI,<br>MERILEE RAINES,<br>ROBERT H. TRICE,<br>THERMO FISHER SCIENTIFIC INC., and<br>WHITE BIRCH MERGER CO.,<br><br>Defendants. | Case No.<br><br>CLASS ACTION<br><br>**CLASS ACTION COMPLAINT FOR BREACH OF FIDUCIARY DUTIES AND INDIVIDUALLY FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Plaintiff Jeffrey S. L. Cheah ("Plaintiff"), individually and on behalf all others similarly situated, by and through his undersigned counsel, alleges the following upon information and belief, including an examination and inquiry conducted by and through his counsel, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge, as follows:

## NATURE AND SUMMARY OF THE ACTION

1.    This is a stockholder class action brought by Plaintiff on behalf of himself and all other similarly situated public stockholders of Affymetrix, Inc. ("Affymetrix" or the "Company"), against the members of Affymetrix's Board of Directors (the "Board" or the "Individual Defendants") for breaches of fiduciary duties owed to the Company's stockholders, and against Affymetrix, Thermo Fisher Scientific Inc. ("Thermo Fisher" or "Parent") and White Birch Merger Co. ("Merger Sub") for aiding and abetting such breaches by the Company's directors, in connection with the Board's agreement to sell the Company to Thermo Fisher (the "Proposed Transaction").  Plaintiff also brings claims in his individual capacity against Affymetrix and the Individual Defendants for their violations of §§14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78n, 78t(a), U.S. Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. 240.14-9, in connection with the Proposed Transaction.

2.    On January 8, 2016, Affymetrix and Thermo Fisher issued a joint press release announcing that they entered into an Agreement and Plan of Merger (the "Merger Agreement") to sell Affymetrix to Thermo Fisher.  Subject to the terms of the Merger Agreement, Affymetrix stockholders will receive $14.00 in cash for each share of Affymetrix they own (the "Merger Consideration").  Following consummation of the Proposed Transaction, Merger Sub will merge with and into Affymetrix with Affymetrix surviving as a

wholly-owned subsidiary of Thermo Fisher. The Proposed Transaction is valued at approximately $1.3 billion.

3. Affymetrix and the Individual Defendants have violated the above-referenced sections of the Exchange Act by causing a materially incomplete and misleading Form PREM14A Preliminary Proxy Statement Proxy Statement (the "Proxy") to be filed with the SEC on February 2, 2016. The Proxy recommends that Affymetrix stockholders vote in favor of approving the Proposed Transaction.

4. As alleged in detail below, the Proposed Transaction is the result of an unfair process and provides the Company's stockholders with inadequate consideration. The inadequacy of the Merger Consideration is evidenced by the fact that as recently as October 28, 2015, an analyst with Mizuho Securities USA Inc. set a $15.00 per share price target for the Company, a $1.00 premium to the Merger Consideration.

5. As further described herein, both the value to Affymetrix stockholders contemplated in the Proposed Transaction, and the process by which Defendants propose to consummate the Proposed Transaction, are fundamentally unfair to Plaintiff and the other public stockholders of the Company. The Individual Defendants' conduct constitutes a breach of their fiduciary duties owed to Affymetrix stockholders, and a violation of applicable legal standards governing the Individual Defendants' conduct.

6. Rather than opting to conduct a value-maximizing market check prior to inking a deal with Thermo Fisher, the Board permitted Affymetrix's President and Chief Executive Officer ("CEO") Frank Witney ("Witney") and its conflicted advisor, Morgan Stanley & Co. LLC ("Morgan Stanley"), to steer negotiations toward their favored bidder, Thermo Fisher. Indeed, after setting a January 26, 2015, deadline for final proposals, on December 31, 2015, the

Board agreed to exclusivity with Thermo Fisher, shutting out three interested bidders – Company A, Company B and Company C – without warning. Notably, Company C subsequently attempted to engage the Company multiple times regarding a sale transaction, to no avail.

7.   Knowing that the inadequate price and opportunistic timing of the Proposed Transaction would draw serious interest from other potential buyers, and in an effort to ensure that the Proposed Transaction is consummated, the Board agreed to include certain provisions in the Merger Agreement that unreasonably inhibit potential third party bidders from launching topping bids, including (i) a strict no-solicitation provision that severely constrains the Individual Defendants' ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals; (ii) a four business day "matching rights" period; and (iii) a termination fee provision requiring the Company to pay $55 million (approximately 4.23% of the Proposed Transaction's total value) to Thermo Fisher in the event the Company receives a higher offer and enters into an alternative transaction.

8.   The termination fee is particularly harmful and problematic, because although the Board claims in the Proxy filed by Affymetrix with the SEC that "the termination fee and related provisions of the merger agreement are customary for transactions of this size and type and would not be preclusive of a topping bid," this is belied by Morgan Stanley's own analysis.  In fact, the 4.23% termination fee is higher than the termination fee for every single precedent transaction, for which public information is available, observed and analyzed by Morgan Stanley in its *Selected Precedent M&A Transaction Analysis* included in the Proxy.

9.   On February 2, 2016, in support of the Proposed Transaction, Affymetrix filed the Proxy that is supposed to provide all material information

to Affymetrix stockholders in seeking their vote and approval of the Proposed Transaction. In violation of §§14(a) and 20(a) of the Exchange Act, and the Board's fiduciary duties, the Board has failed to provide the Company's stockholders with material information necessary for them to make an informed decision on whether to vote in favor of the Proposed Transaction or seek appraisal. Among other things, the Proxy contains numerous material misstatements and omissions concerning: (i) the key inputs and assumptions underlying the valuation analyses prepared by Morgan Stanley in connection with the rendering of its fairness opinion in support of the Proposed Transaction; (ii) key projections prepared by Affymetrix; and (iii) material information concerning the sales process leading up to the Proposed Transaction.

10. For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless or until the material information omitted from the Proxy is disclosed or, in the event the Proposed Transaction is consummated, to recover damages resulting from Defendants' violations of the Exchange Act and their fiduciary duties.

### JURISDICTION AND VENUE

11. The court has jurisdiction pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331 (federal question jurisdiction) as Plaintiff alleges violations of §§14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9. This Court may exercise supplemental jurisdiction, in accordance with 28 U.S.C. §1367, over Plaintiff's state law claims.

12. Personal jurisdiction exists over each defendant either because the defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has

sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant permissible under traditional notions of fair play and substantial justice.

13. Venue is proper in this Court pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as under 28 U.S.C. §1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) Affymetrix maintains its principal place of business in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

**INTRADISTRICT ASSIGNMENT**

14. A substantial part of the events which give rise to the claims in this action occurred in the County of Santa Clara, and as such this action is properly assigned to the San Jose Division of this Court, as provided by Local Rules 3-2(e) and 3-5(b). However, as indicated in the Civil Cover Sheet filed concurrently herewith, this action is related to *Douglas v Witney, et al.*, Case No. 16-CV-00921, currently assigned to Honorable William H. Orrick.

**THE PARTIES**

15. Plaintiff is, and has been at all times relevant hereto, a stockholder of Affymetrix and has held such shares since prior to the wrongs complained of herein. Plaintiff is a citizen of Toronto, Ontario, Canada.

16. Affymetrix, a Delaware corporation, is a pioneer in microarray technology and a leader in genomics analysis. The Company develops and provides innovative technologies that enable multiplex and parallel analysis of biological systems at the cell, protein, and gene level. Affymetrix's corporate

headquarters are located at 3420 Central Expressway, Santa Clara, California 95051. Its common stock is traded on the NASDAQ under the symbol "AFFX."

17. Defendant Jami Dover Nachtsheim ("Nachtsheim") has been Chairwoman of the Board since January 2015 and a director of the Company since March 2010. Defendant Nachtsheim is Chairwoman of the Compensation Committee and is a member of the Nominating and Corporate Governance Committee.

18. Defendant Witney has been President and CEO of the Company since July 2011. Defendant Witney previously served as Affymetrix's Executive Vice President and Chief Commercial Officer following the Company's acquisition of Panomics, Inc., where he served as President and CEO.

19. Defendant Nelson C. Chan ("Chan") has been a director of the Company since March 2010. Defendant Chan is Chairman of the Audit Committee and is a member of the Compensation Committee.

20. Defendant Gary S. Guthart ("Guthart") has been a director of the Company since May 2009. Defendant Guthart is a member of the Compensation Committee.

21. Defendant Riccardo Pigliucci ("Pigliucci") has been a director of the Company since May 2015. Defendant Pigliucci is a member of the Compensation Committee.

22. Defendant Merilee Raines ("Raines") has been a director of the Company since January 2015. Defendant Raines is a member of the Audit Committee.

23. Defendant Robert H. Trice ("Trice") has been a director of the Company since 2006. Defendant Trice is Chairman of the Nominating and

Corporate Governance Committee, and is a member of the Audit Committee.

24. Defendants set forth in paragraphs 17 through 23 are referred to herein as the "Individual Defendants." By virtue of their positions as directors or officers of Affymetrix, the Individual Defendants are in a fiduciary relationship with Plaintiff and the other public stockholders of Affymetrix.

25. Each of the Individual Defendants at all relevant times had the power to control and direct Affymetrix to engage in the misconduct alleged herein. The Individual Defendants' fiduciary obligations required them to act in the best interest of Plaintiff and all Affymetrix stockholders.

26. Each of the Individual Defendants owes fiduciary duties of loyalty, good faith, due care, and full and fair disclosure to Plaintiff and all Affymetrix stockholders. The Individual Defendants are acting in concert with one another in violating their fiduciary duties as alleged herein, and, specifically, in connection with the Proposed Transaction.

27. Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, violated, and are continuing to violate, the fiduciary duties they owe to Plaintiff and the Company's other public stockholders, due to the fact that they have engaged in all or part of the unlawful acts, plans, schemes, or transactions complained of herein.

28. Defendant Thermo Fisher, a Delaware corporation, is a Massachusetts-based multinational biotechnology product development company. Its corporate headquarters are located at 81 Wyman Street, Waltham, Massachusetts 02451. Its common stock is traded on the New York Stock Exchange under the symbol "TMO."

29. Defendant Merger Sub is a Delaware corporation and a direct wholly-owned subsidiary of Parent.

30.  Defendants Affymetrix, the Individual Defendants, Thermo Fisher and Merger Sub are collectively referred to as the "Defendants."

## INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

31.  By reason of the Individual Defendants' positions with the Company as officers or directors, they are in a fiduciary relationship with Plaintiff and the Company's public stockholders, and owe them, as well as the Company, a duty of care, loyalty, good faith, and independence.

32.  To diligently comply with their fiduciary duties, the Individual Defendants may not take any action that:

(a)  adversely affects the value provided to the corporation's stockholders;

(b)  favors themselves or will discourage or inhibit alternative offers to purchase control of the corporation or its assets;

(c)  adversely affects their duty to search and secure the best value reasonably available under the circumstances for the corporation's stockholders; or

(d)  will provide the Individual Defendants with preferential treatment at the expense of, or separate from, the public stockholders.

33.  In accordance with their duties of loyalty and good faith, the Individual Defendants are obligated to refrain from:

(a)  participating in any transaction where the Individual Defendants' loyalties are divided;

(b)  participating in any transaction where the Individual Defendants receive, or are entitled to receive, a personal financial benefit not equally shared by the public stockholders of the corporation; or

(c)  unjustly enriching themselves at the expense or to the detriment of the public stockholders.

34.   Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, are knowingly or recklessly violating their fiduciary duties, including their duties of care, loyalty, good faith, and independence owed to Plaintiff and the Company's public stockholders.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

35.   In committing the wrongful acts alleged herein, Defendants have pursued, or joined in the pursuit of, a common course of conduct, and acted in concert with and conspired with one another, in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, Defendants further aided and abetted or assisted each other in breach of their respective duties as herein alleged.

36.   Each Defendant herein aided and abetted and rendered substantial assistance in the wrongs complained of herein.   In taking such actions as particularized herein, to substantially assist the commission of the wrongdoing complained of, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to, and furtherance of, the wrongdoing.  Defendants' acts of aiding and abetting, included the acts each of them are alleged to have committed in furtherance of the conspiracy, common enterprise and common course of conduct complained of herein.

### CLASS ACTION ALLEGATIONS

37.   Plaintiff brings Counts III-VI as a class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and all other public stockholders of Affymetrix (the "Class").   Excluded from the Class are Defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

38. The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class. As of January 5, 2016, 80,490,520 shares of common stock were represented by the Company as outstanding. All members of the Class may be identified from records maintained by Affymetrix or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to those customarily used in securities class actions.

39. There are questions of law and fact which are common to the Class and which predominate over questions affecting individual Class members, including, *inter alia*, the following:

(a) whether the process implemented and set forth by the Defendants for the Proposed Transaction, including but not limited to, the Merger Agreement, the Proposed Transaction, and the negotiations concerning the Merger Agreement and the Proposed Transaction, is entirely fair to the members of the Class;

(b) whether the Individual Defendants breached their fiduciary duties of loyalty, good faith, independence or due care with respect to Plaintiff and the other members of the Class in connection with the Proposed Transaction;

(c) whether the Individual Defendants, in bad faith and for improper motives, have impeded or erected barriers to discourage other offers for the Company and its assets;

(d) whether the Individual Defendants have failed to disclose all material information to the Company's public stockholders;

(e) whether Affymetrix, Thermo Fisher and Merger Sub have aided and abetted the Individual Defendants' breaches of fiduciary duties; and

(f) whether Plaintiff and the other members of the Class would be irreparably harmed if Defendants are not enjoined from effectuating the Proposed Transaction as a result of the wrongful conduct described herein; and whether Plaintiff and the Class are entitled to injunctive relief, damages or other relief.

40. Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the other members of the Class have sustained damages as a result of Defendants' wrongful conduct as alleged.

41. Plaintiff will fairly and adequately protect the interests of the Class, and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent.

42. Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

43. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

## SUBSTANTIVE ALLEGATIONS

**Background of the Company and its Positioning for Growth and Success**

44. Affymetrix was formed as a division of Affymax, N.V. in 1991 and began operating independently in 1992. The Company completed its initial public offering in June 1996, and is based in Santa Clara, California. Affymetrix commenced commercial sales of the GeneChip system for research use in 1994 and currently sells its products directly to pharmaceutical,

biotechnology, agrichemical, diagnostic and consumer products companies, as well as academic, government, and other non-profit research institutes.

45.  The Company has an extensive portfolio of translational and clinical solutions that enable scientists and clinicians to rapidly translate their research into understanding underlying disease mechanisms, identifying biomarkers for personalized medicine, creating novel molecular diagnostic tests, and improving genetic marker-assisted breeding programs in agriculture for human health and wellness.  Since 2000, Affymetrix has completed seven strategic transactions whereby it acquired a number of companies, including eBioscience, Inc. in 2012 and Panomics, Inc. in 2008.

46.  Affymetrix is positioned for future growth and success.

47.  Under Defendant Witney's leadership, the Company has focused on realigning its product portfolio, stabilizing its core business and positioning Affymetrix for growth and profitability (the "Strategic Plan").  As disclosed by the Company in a Form 8-K filing with SEC on April 29, 2015, the three-part Strategic Plan has been set in two-year phases: (i) Phase 1 [2011-2012]: Portfolio Realignment; (ii) Phase II [2013-2014]: Profitability, Strengthen Balance Sheet, Development of Newer Product Lines; and (iii) Phase III [2015-2016]: Strategic Flexibility, Expansion of Product Lines, Growth.

48.  On April 29, 2015, Affymetrix issued a press release announcing its first quarter ("1Q") 2015 financial results.  For 1Q 2015, the Company reported revenue of $88.7 million, as compared to $83.0 million year over year.  Reported revenue growth was 6.9% and 9.1% on a constant currency basis.  GAAP net income was $4.4 million, or $0.06 per diluted share, as compared to a GAAP net loss of $10.5 million, or $0.14 per diluted share year over year.

49.  Commenting on the impressive financial results, Defendant Witney stated:

Phase III of our strategic plan is off to a good start. Our priorities are clear, primarily to grow revenues, achieve sustained profitability and build cash to increase our strategic flexibility. In the first quarter, we generated topline growth of 9% on a constant currency basis driven by strong performance of our genotyping and reproductive health businesses. We generated an adjusted EBITDA margin of 19% and our earnings per share more than tripled over the prior year.

50. On July 29, 2015, Affymetrix announced its second quarter ("2Q") 2015 financial results.   The Company reported revenue of $89.0 million, compared to revenue of $85.4 million year over year.  Reported revenue growth was 4.1% and 7.9% on a constant currency basis.  Non-GAAP net income was $10.5 million, or $0.12 per diluted share, compared to non-GAAP net income of $5.2 million, or $0.07 per diluted share year over year.

51. Commenting on the promising quarter, Defendant Witney stated:

We generated topline growth of 8% on a constant currency basis in the second quarter driven by continued momentum in our clinical business and solid performance in our eBioscience business. We reiterate our guidance for full year revenue growth in the mid-single digit range on a constant currency basis and we are raising our adjusted EBITDA guidance from a range of 16-18% to 17-19% for 2015.

52. On October 28, 2015, the Company issued a press release announcing its third quarter ("3Q") 2015 financial results.  Affymetrix reported revenue of $86.5 million, compared to revenue of $87.1 million year over year. Reported revenue decreased 0.6%, but increased 3.6% on a constant currency basis.  Commenting on the quarter, defendant Witney stated:

We generated strong growth in our clinical and eBioscience businesses in Q3 which grew by more than 30% and 11% respectively, the strongest organic growth for eBioscience since we completed the acquisition more than three years ago. We reiterate our FY15 guidance for mid-single digit revenue growth. As a result of our strong gross margin and continued cost controls, we are raising our adjusted EBITDA guidance to 18-20% for 2015.

53. While speaking at an employee town hall in Santa Clara, California

on January 8, 2016, Defendant Witney discussed the successful completion of the Strategic Plan:

> [The Proposed Transaction] recognizes the hard work and commitment all of you have made to the successful execution of our three-phase strategic plan to return the company to growth and profitability. Together, we have built a company that has created best-in-class products that have fundamentally advanced life science research and brought powerful new technologies into the clinic. Your relentless focus on commercial, operational and financial excellence has made Affymetrix an iconic brand in our industry and has allowed us to achieve a level of engagement and collaboration with our customer's that surpasses anything I've seen in my 30 plus years in the industry.

**The Inadequate Process Preceding the Execution of the Merger Agreement**

54. The Proposed Transaction is the result of a fatally flawed process resulting in inadequate consideration offered to the Company's shareholders.

55. In mid-October 2015, the CEO of Company A told Defendant Witney that Company A intended to submit a proposal to acquire Affymetrix for $1 billion, to be paid in a combination of cash and Company A common stock.

56. At an October 19, 2015 Board meeting, the Board discussed Company A's impending proposal. The Board determined to retain a financial advisor and authorized the retention of Morgan Stanley, subject to confirming the absence of conflicts.

57. Also in October 2015, Company B requested to meet with Affymetrix management.

58. Then, on November 2, 2015, Company A submitted a written non-binding proposal to acquire Affymetrix for $10.00 per share, split approximately 50/50 between cash and Company A common stock based on a fixed exchange ratio to be set at the time of signing.

59. At the November 4 and 5, 2015 Board meetings, the Board reviewed Company A's proposal and found it was inadequate. The Board instructed

Morgan Stanley to advise Company A's financial advisor that the price proposed by Company A was not at a level warranting further engagement. The Board also discussed process considerations, including eight other strategic and two financial counterparties who might have an interest in acquiring the Company.

60. On November 23, 2015, Company B submitted a written non-binding proposal to acquire Affymetrix for $11.20 per share in cash. Around the same time, Company A's financial advisor indicated that Company A intended to submit a revised proposal at a higher per share valuation, but indicated that Company A was not willing to transact at materially higher levels. At Affymetrix's direction, Morgan Stanley conveyed to Company A that any revised proposal should be submitted in advance of a Board meeting planned for December 1, 2015.

61. On November 30, 2015, Company A submitted a revised written non-binding proposal of $11.00 to $11.50 per share, split 50/50 between cash and shares of Company A common stock, with all other terms the same as those in Company A's initial proposal.

62. At a December 1, 2015 Board meeting, the Board decided to pursue a staged multi-party process. This process consisted of (a) an outreach to three additional strategic parties, including Thermo Fisher, Company C and Company D; and (b) further engagement with Company A and Company B. The Board set a goal of signing a definitive agreement by late January 2016 or early February 2016.

63. What followed was a "process" led by Defendant Witney, a conflicted director, and Morgan Stanley, a conflicted financial advisor who was more interested in obtaining future business rather than conducting a thorough process to sell the Company. Indeed, at an undisclosed time, following the

October 19, 2015 Board meeting, the Board was informed that Morgan Stanley had certain past and ongoing engagements with Thermo Fisher.  According to the Proxy, from December 11, 2013 to January 4, 2016, Morgan Stanley and its affiliates have provided financing services to Thermo Fisher for which Morgan Stanley or its affiliates have received fees of approximately $2 million from Thermo Fisher.  In addition, Morgan Stanley also has undisclosed current assignments with Thermo Fisher unrelated to the Proposed Transaction for which Morgan Stanley will likely receive additional fees.

64.  Between December 3 and December 7, 2015, Morgan Stanley contacted the three other additional strategic parties.  Company D declined to participate in the process, while Thermo Fisher and Company C expressed interest in a potential acquisition of Affymetrix.

65.  In early December, Affymetrix entered into confidentiality agreements with Company A, Company B, Company C and Thermo Fisher. Company A and Company B were given access to an online data room on December 11 and December 10, respectively.

66.  Affymetrix management held initial due diligence discussions with Thermo Fisher and Company C on December 16 and December 18, respectively.  Following these discussions, Morgan Stanley asked Thermo Fisher and Company C to submit initial indications of value as soon as possible, and preferably before Christmas.

67.  On December 22, 2015, Thermo Fisher submitted a non-binding written proposal to acquire all of Affymetrix outstanding shares of common stock, on a fully-diluted basis, for consideration of $12.00 to $13.00 per share of Affymetrix common stock in cash, with no financing condition.  Company C requested access to the data room for additional information prior to submitting a proposal.  Affymetrix refused to provide Company C with access without a

written indication of value.

68. On December 23, 2015, the Board met with Affymetrix management and its legal and financial advisors to receive an update on the process and consider the price indications and process developments. Following discussion, the Board authorized management and Morgan Stanley to permit Thermo Fisher to enter the next phase of the process and to provide Thermo Fisher access to the data room. The Board also instructed management to not give Company C access to the data room or other detailed due diligence information without an indication of value.

69. On December 23, 2014, Morgan Stanley sent process letters requesting a final proposal deadline of January 26, 2016 to the financial advisors of Company A and Company B, and on December 24 to Thermo Fisher.

70. On December 24, 2015, Thermo Fisher CEO Casper told Defendant Witney that Thermo Fisher was interested in entering into an exclusivity agreement with Affymetrix.

71. On December 28, 2015, Company C submitted a written non-binding proposal to acquire all of Affymetrix outstanding shares of common stock, on a fully diluted basis, for consideration of $11.25 to $11.50 per share of Affymetrix common stock in cash, with no financing contingency and the need to conduct customary due diligence, including additional meetings with Affymetrix management and access to additional information. Despite providing a written indication of value, Company C was not provided access to the data room and did not receive a process letter.

72. Also on December 28, 2015, the Board met with Affymetrix management and its legal and financial advisors and reviewed the process and interactions to date with the four strategic bidders, including Thermo Fisher and

Company C's recent bids.  Notably, the Board acknowledged that "Company C likely had the financial wherewithal to increase its proposal and to compete with Thermo Fisher's initial proposal. . . ."  Following discussion and based on, among other things, Morgan Stanley's valuation analyses, the Board authorized Defendant Witney to respond to Thermo Fisher's CEO Casper with price guidance in the mid-$14s per Affymetrix share.  In addition, without giving Company A, Company B or Company C an opportunity to increase their bids, the Board authorized Defendant Witney to enter into an exclusivity agreement with Thermo Fisher.

73.  On December 29, 2015, Defendant Witney communicated the Board's message and price guidance to Casper.  Following negotiations and additional due diligence by Thermo Fisher, on December 31, 2015, Affymetrix and Thermo Fisher entered into an exclusivity agreement that reflected a price of $14.00 per share, a target signing date of January 8, 2016, and an exclusivity period that would end on January 12, 2016.  In accordance with the terms of the exclusivity agreement, Morgan Stanley informed Company A, Company B and Company C that Affymetrix was no longer pursuing a process with them.

74.  On January 4, 2016, Company C submitted an unsolicited revised written non-binding proposal to acquire Affymetrix at a price of $12.50 per share in cash.  The next day, on January 5, Company C submitted an unsolicited further revised written non-binding proposal to acquire Affymetrix for $13.50 per share in cash.  Affymetrix did not provide a substantive response to either of these proposals.

75.  On January 7, 2016, the Board met to review progress with Thermo Fisher and the proposals from Company C.  Rather than engage Company C, the Board authorized Affymetrix management and its advisors to continue working toward an agreement with Thermo Fisher, with announcement planned for the

following day, subject to the Board's final approval.   Critically, despite Company C's clear interest in acquiring the Company and multiple attempts to engage Affymetrix, the Board apparently made no attempt to remove barriers that work to preclude Affymetrix from receiving topping bids that would inure to its stockholders' benefit.   As further discussed below, the Board instead agreed to an exorbitant and unreasonable 4.23% termination fee that effectively shuts out Company C and any other bidder from making a topping bid for the Company.

76.   On January 8, 2016, Morgan Stanley delivered its opinion to the Board that the Proposed Transaction was fair to Affymetrix shareholders from a financial point of view.   The same day, the Board approved the Merger Agreement and Affymetrix and Thermo Fisher executed the Merger Agreement.

**The Proposed Transaction**

77.   On January 8, 2016, Affymetrix and Parent issued a joint press release announcing the Proposed Transaction.   The press release stated, in pertinent part:

> WALTHAM, Mass. and SANTA CLARA, Calif.-- Thermo Fisher Scientific Inc. (NYSE: TMO), the world leader in serving science, and Affymetrix Inc. (NASDAQ: AFFX), a leading provider of cellular and genetic analysis products, today announced that their boards of directors have unanimously approved Thermo Fisher's acquisition of Affymetrix for $14.00 per share in cash. The transaction represents a purchase price of approximately $1.3 billion.
>
> Affymetrix's technologies enable parallel and multiplex analysis of biological systems at the cellular, protein and genetic level, facilitating the transition of research tools into clinical and applied markets. The company's products are used by customers working in life sciences and translational research, molecular diagnostics, reproductive health and agricultural biotechnology. Based in Santa Clara, California, Affymetrix has approximately 1,100 employees worldwide and maintains sales and distribution operations primarily in the U.S., Europe and Asia. The business, which has annual revenues of approximately $350 million, will be integrated into Thermo Fisher's Life Sciences Solutions Segment.

**The Proposed Transaction Offers Inadequate Consideration**

78.  Given the success of the Strategic Plan and the potential for greater growth and strong earnings, the Proposed Transaction fails to adequately compensate Plaintiff and the Class or the intrinsic value of their shares of Affymetrix common stock, as well as the significant benefits Thermo Fisher will receive from the Proposed Transaction.

79.  Since the Company embarked on the Strategic Plan, its financial results have continually improved.  However, its stock price has not yet reflected the benefits of the Strategic Plan.  Despite this, the Company's prospects remain strong.  For Q1, Q2 and Q3 2015, Affymetrix reported $0.07 earnings per share ("EPS"), compared to -$0.05 EPS for fiscal year 2014. According to *Zacks Investment Research*, ratings analysts forecast that Affymetrix will post $0.42 EPS for fiscal year 2015, compared to Affymetrix's $0.30 EPS for fiscal year 2014.  Unfortunately, by pursuing the Proposed Transaction at this time, the Individual Defendants are attempting to prevent Plaintiff and the Class from enjoying the Company's foreseeable business prospects and strong earnings potential on the horizon.

80.  As recently as October 28, 2015, analyst Eric Criscuolo at Mizuho Securities USA Inc. set a $15.00 per share target price for Affymetrix, $1.00 above the Merger Consideration.

81.  Importantly, the Proposed Transaction fails to adequately compensate Plaintiff and the Class for the significant benefits that Thermo Fisher will receive from the Proposed Transaction.  In the January 8, 2016 joint press release, Casper touted the benefits to Thermo Fisher, stating:

> The acquisition of Affymetrix will strengthen our leadership in biosciences and create new market opportunities for us in genetic analysis. In biosciences, the company's antibody portfolio will significantly expand our offering in the fast-growing flow cytometry market, and customers will have greater access to these products through our global scale and commercial reach. In genetic

analysis, Affymetrix's technologies are highly complementary and present new opportunities for us in targeted clinical and applied markets. For shareholders, we expect the transaction to create value by generating attractive financial returns, including immediate accretion to our adjusted EPS.

82. The January 8, 2016 joint press release also contains a section touting the benefits of the Proposed Transaction to Thermo Fisher:

Benefits of the Transaction

Significantly Expands Antibody Portfolio to Strengthen Leadership in Biosciences. Affymetrix's eBioscience offering for cellular analysis will *enhance Thermo Fisher's leading biosciences capabilities*. Specifically, the company specializes in a range of antibodies, multiplex RNA, and protein and single-cell assays. These technologies serve the fast-growing flow cytometry market segment as well as new high-growth applications including single-cell biology, immunotherapy and infectious disease research.

Adds Genetic Analysis Capabilities Serving Clinical and Applied Markets. Affymetrix adds complementary products in genetic analysis that are used in cytogenetics, genotyping and gene expression. The company's innovative microarray platform will *strengthen Thermo Fisher's presence in certain clinical and applied markets*, including reproductive health and agricultural biotechnology.

Offers Opportunity to Leverage Commercial and Geographic Scale. Affymetrix will benefit from Thermo Fisher's access to the biopharma industry through its unique customer value proposition, as well as its world-class e-commerce capabilities and extensive customer channels. Thermo Fisher will also significantly extend the geographic reach of Affymetrix's products by leveraging its market presence and infrastructure in Asia-Pacific, particularly China.

Creates Attractive Financial Benefits. The transaction is expected to be immediately accretive to Thermo Fisher's adjusted EPS1, adding $0.10 of accretion in the first full year of ownership. Thermo Fisher expects to realize *total synergies of approximately $70 million* by year three following the close, consisting of approximately $55 million of cost synergies and approximately $15 million of adjusted operating income benefit from revenue-related synergies.

Emphasis added.

83. In a January 11, 2016 *Zacks* article, Zacks Equity Research wrote about the benefits of the Proposed Transaction to Thermo Fisher. Specifically, the article noted:

Among other significant integration synergies that Thermo Fisher expects to achieve through this impending buyout is easy access to the biopharma industry through Affymetrix's advanced customer value proposition, e-commerce capabilities and extensive customer channels. Additionally, Thermo Fisher will be able to enjoy extended geographic reach in Asia-Pacific, particularly China.

Furthermore, Thermo Fisher expects this acquisition, which is expected to be completed by the end of the second quarter of 2016, to generate attractive financial returns, including an accretion of 10 cents to its adjusted EPS in the first full year of acquisition.

84.   In a separate January 11, 2016 *Zacks* article, TheStreet Ratings team analyzed Affymetrix's current condition:

The current debt-to-equity ratio, 0.38, is low and is below the industry average, implying that there has been **successful management of debt levels**. Along with this, the company maintains a quick ratio of 2.61, which clearly demonstrates the ability to cover short-term cash needs.

**Net operating cash flow has increased** to $23.12 million or 11.71% when compared to the same quarter last year. In addition, AFFYMETRIX INC has also modestly **surpassed the industry average cash flow growth rate** of 7.02%.

AFFYMETRIX INC has experienced a steep decline in earnings per share in the most recent quarter in comparison to its performance from the same quarter a year ago. This company has reported somewhat volatile earnings recently. But, we feel it is **poised for EPS growth in the coming year**. During the past fiscal year, AFFYMETRIX INC continued to lose money by earning -$0.07 versus -$0.27 in the prior year. This year, the market expects an improvement in earnings ($0.42 versus -$0.07).

Emphasis added.

85.   On January 19, 2016, *Zacks Investment Research* upgraded shares of Affymetrix from a hold rating to a buy rating.   In explaining its updated analysis, *Zacks* explained:

Affymetrix reported a **stellar third quarter** of 2015, generating **year-over-year revenue growth for the ninth consecutive time**. This also marks the seventh straight quarter of a positive earnings surprise at the company. We believe that the company's strategy of diversifying revenues and focusing on new market opportunities is paying off. The genetic analysis business continues to be the primary growth driver for the company. Moreover, we feel that the collaboration with Toshiba Corp and the U.K. Biobank contract will open up **new opportunities for Affymetrix** and help the company gain significant market traction, going forward. In

- 23 -

COMPLAINT

addition, *the rollout of new products is a key growth catalyst*. However, recent foreign exchange volatility may impact top-line growth in the near term.

Emphasis added.

86.   Also notable was J.P. Morgan Chase & Co.'s ("JP Morgan") analysis of Affymetrix published on October 28, 2015.  In addition to examining the Company's financial performance during 3Q 2015, JP Morgan's North American Equity Research analysts noted that the Company may be positively impacted by certain factors in 2016 and beyond.  The analysts wrote:

**eBioscience grows at its fastest pace since acquisition.** eBioscience saw reported growth of +11% (strongest growth since the acquisition) vs. +2.5% in 2Q15 and +3.4% in 1Q15, as the business continues to expand into new areas, including translational research, immunotherapy for oncology and single cell biology (for example, the pharma business grew +20% y/y). AFFX also highlighted growing traction for new products including a recently-announced extension for the QuantiGene Singleplex Assay for PCR-free gene expression measurement to include both 96- and 384-well format, as well as pharma customers adopting the QuantiGene View cell-based RNA assay for applications such as HBV antiviral screening. Finally, the Luminex distribution agreement is also expected to drive adoption of bead-based multiplex assays, as eBioscience can now sell LMNX instruments, which support ProCarta and QuantiGene Plex product lines.

**Eureka Genomics acquisition expected to contribute to revenues in 2016, with a ~$100M annual TAM in three years.** Management noted that the company has made good progress commercializing the low-plex Eureka Genomics platform since close of the deal in May, and expects Eureka to begin contributing to Genetic Analysis revenues starting in 2016 with the addressable market for low-plex applications anticipated to expand to ~$100M annually in the next three years. As a reminder, in May, AFFX acquired Eureka Genomics, a developer of low-to-mid-plex, high throughput genotyping assays, for $15M in an all-cash transaction. Eureka's assays use common NGS platforms for signal readout and enable the detection of genetic markers that are becoming increasingly-utilized by routine crop and animal agrigenomics testing. Regarding future M&A activity, management continues to indicate that it is targeting smaller tick-in deals that help them go deeper in existing verticals.

87.   Unfortunately for Plaintiff and the Class, despite the tremendous potential of the Company and the significant benefits to Thermo Fisher, the

Board members failed to secure a fair deal for the Company, either for the intrinsic value of its assets or the value of the Company's assets to Thermo Fisher in a combined entity.

**The Merger Agreement Contains Unreasonable Deal Protection Provisions**

88. In addition to concerns regarding the inadequate Merger Consideration, the Merger Agreement features several provisions that work to preclude other bidders from stepping forward with a superior alternative offer. At best, these provisions place stockholders in an unfortunate position and, at worst, question the impartiality of the Individual Defendants in the negotiation process.

89. In a breach of their fiduciary duties, the Individual Defendants have agreed to the following unreasonable deal protection devices:

- A "no-solicitation" clause that prevents Affymetrix from soliciting, or its directors and officers from even participating in discussions that may lead to a superior proposal from any bidder (Merger Agreement, Section 6.03 (a));

- An "information rights" provision whereby the Company must notify Thermo Fisher, within twenty-four hours, of any proposals or inquiries received from other parties, including, *inter alia*, the material terms and conditions of the proposal and the identity of the party making the proposal (Merger Agreement, 6.03(c));

- A "matching rights" provision that requires the Company to provide Thermo Fisher with the identity of any competing bidders, as well as the material terms of any competing offer, and allow Thermo Fisher four (4) days to match any superior offer (Merger Agreement, Section 6.03(b)(iii)); and

- A termination fee of $55 million payable by the Company to Thermo Fisher if Affymetrix decides to pursue a competing bid (Merger

Agreement, Section 11.04).

90.  The $55 million termination fee represents approximately 4.23% of the Proposed Transaction's total value, and serves as a boon for Thermo Fisher, rather than making it whole should the Proposed Transaction not go through.

91.  Notably and detrimentally to the possibility of a topping bid, the 4.23% termination fee is substantially higher than the termination fee for every single precedent transaction, for which public information is available, observed and analyzed by Morgan Stanley in its *Selected Precedent M&A Transaction Analysis*.  In fact, the range of termination fees observed and analyzed by Morgan Stanley in its *Selected Precedent M&A Transaction Analysis* was 1.9% - 3.8% with a mean and median of 3.1%.  The 4.23% termination is unreasonable based on Affymetrix's financial advisor's own analysis and makes the Board's statement in the Proxy that "the termination fee . . . [is] customary for transactions of this size and type and would not be preclusive of a topping bid [and] . . . that the $55.0 million termination fee was reasonable, particularly in light of the process conducted by the Board with the assistance of Affymetrix management and its advisors" false or misleading.  The full range of termination fees for the precedent transactions observed and analyzed by Morgan Stanley in its *Selected Precedent M&A Transaction Analysis* included in the Proxy are set forth in the following table:

| Buyer/Target | Final Equity Value at Announcement ($ in millions) | Target's Termination Fee ($ in millions) | Target Termination Fee as % of Value |
|---|---|---|---|
| Danaher Corporation/Pall Corporation | 13,632.6 | 423.2 | 3.1% |
| FUJIFILM Holdings Corporation/Cellular Dynamics International Inc. | 274.0 | 8.3 | 3.0% |
| Thermo Fisher Scientific Inc./Advanced Scientifics Inc. | 300.0 | N/A | N/A |

| Merck KGaA/Sigma-Aldrich Corporation | 16,860.6 | 318.5 | 1.9% |
|---|---|---|---|
| Bio-Techne Corporation/Protein Simple | 300.0 | N/A | N/A |
| Fluidigm Corporation/DVS Sciences | 207.5 | N/A | N/A |
| General Electric/Thermo Fisher Strategic Assets | 1,065.0 | N/A | N/A |
| Qiagen N.V./Ingenuity Systems, Inc. | 109.4 | N/A | N/A |
| Thermo Fisher Scientific Inc./Life Technologies Corporation | 13,249.5 | 485.0 | 3.7% |
| BGI/Complete Genomics Inc. | 108.0 | 4.0 | 3.7% |
| Sigma-Aldrich Corporation/BioReliance | 350.0 | N/A | N/A |
| Affymetrix Inc./eBioscience, Inc. | 315.0 | N/A | N/A |
| PerkinElmer, Inc./Caliper Life Sciences, Inc. | 591.5 | 12.8 | 2.2% |
| Techne Corporation/Tocris Holdings Limited | 75.0 | N/A | N/A |
| Thermo Fisher Scientific Inc./Dionex Corporation | 2,127.8 | 65.0 | 3.1% |
| Life Technologies Corporation/Ion Torrent | 375.0 | N/A | N/A |
| Merck KGaA/Millipore Corporation | 6,041.0 | 230.0 | 3.8% |

92.   The "no solicitation" clause, the "information rights" provision, the "matching rights" provision, and the termination fee unfairly restrain the Individual Defendants' ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.  The circumstances under which the Board may respond to a third party's written *bona fide* proposal for an alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.

93.   The reason behind these deal protection devices is clear: the absence of a meaningful premium for stockholders creates the very real potential that a

third party bidder will attempt to usurp Thermo Fisher and submit a higher bid for Affymetrix.  The possibility that a third-party bidder will emerge motivated Parent to "lock-up" the Proposed Transaction by co-opting the Board and forcing them to adopt unreasonable deal protection devices that would ensure that Thermo Fisher could purchase the Company for less than would otherwise be possible.

**Conflicts of Interest**

94. Compounding the Individual Defendants' breaches of fiduciary duties, the Board ignored or failed to protect against numerous conflicts of interest in connection with the Proposed Transaction.  The Board engaged Morgan Stanley to act as its independent financial advisor in recommending whether Affymetrix should enter into a transaction with Thermo Fisher and whether the Merger Consideration of $14.00 per share is fair.  However, Morgan Stanley is conflicted as it has a prior and existing relationship with Thermo Fisher.

95. Indeed, from December 11, 2013 to January 4, 2016, Morgan Stanley and its affiliates have provided financing services to Thermo Fisher for which Morgan Stanley or its affiliates have received fees of approximately $2 million from Thermo Fisher.  In addition, Morgan Stanley also has undisclosed current assignments with Thermo Fisher unrelated to the Proposed Transaction for which Morgan Stanley will likely receive additional fees.  During the same period, Morgan Stanley or its affiliates have received fees of less than $50,000 from Affymetrix.

96. The conflicts of interest do not end with Morgan Stanley.  Certain members of the Board and Company management have a substantial financial interest in the Proposed Transaction.  Specifically, while the Company's public stockholders are being cashed out for the inadequate Merger Consideration, it

appears Defendant Witney and certain members of management may have secured positions with the Thermo Fisher, allowing them to participate in and enjoy the benefits of the post-merger company.  In the January 8, 2016 press release, Thermo Fisher CEO Casper stated: "[w]e're pleased to welcome our new colleagues from Affymetrix to Thermo Fisher . . ."  Notably, this is the second company that Defendant Witney has sold to Thermo Fisher, with the previous being Dionex Corporation ("Dionex") in 2010.  Casper and Witney, then Dionex's CEO, spearheaded that deal.

97.  In connection with the Dionex merger, Defendant Witney received over $9 million in change in control payments.  Similarly, if Defendant Witney and certain members of Affymetrix management are terminated in connection with the Proposed Transaction, they will benefit from the accelerated vesting of unvested Affymetrix stock options and restricted stock units, in addition to lump sum cash payments.  The entirety of the "golden parachute compensation" Affymetrix insiders will be entitled to receive if they are terminated in connection with the Proposed Transaction is summarized in the following chart:

### Golden Parachute Compensation

| Name | Cash(1) | Equity(2) | Perquisites/ Benefits(3) | Total(4) |
|---|---|---|---|---|
| Frank Witney, Ph.D. | $2,337,000.00 | $5,752,680.00 | $ 62,497.66 | $8,152,177.66 |
| Andrew J. Last, Ph.D. | 1,344,000.00 | 1,975,068.50 | 81,453.28 | 3,400,521.78 |
| David Weber | 1,237,500.00 | 1,845,044.50 | 41,827.43 | 3,124,371.93 |
| Gavin Wood | 1,200,000.00 | 2,070,125.00 | 53,751.60 | 3,323,876.60 |

98.  In addition, under the Merger Agreement, the non-employee directors' outstanding stock options and restricted stock units will automatically

vest at the closing of the Proposed Transaction.  As stated in Section 2.05 of the Merger Agreement:

(a) At or immediately prior to the Effective Time, (i) each option to purchase Shares outstanding under any Company Stock Plan (a "**Company Stock Option**") that is fully vested as of immediately prior to the Effective Time (a "**Vested Company Stock Option**") shall terminate and cease to represent a right to acquire Shares, and the holder thereof shall be entitled to receive therefor an amount of cash equal to the product of (x) the number of Shares that were purchasable upon exercise of such Vested Company Stock Option, multiplied by (y) the excess (if any) of the Merger Consideration over the exercise price of such Vested Company Stock Option, which amount shall be payable as soon as practicable following the Effective Time (but not later than ten (10) Business Days thereafter in any event); and (ii) each Company Stock Option that is not fully vested as of immediately prior to the Effective Time (an "**Unvested Company Stock Option**") shall be assumed by Parent and converted into an award (an "**Assumed Option**") representing a right to receive a cash amount equal to the product of (x) the number of Shares underlying the Unvested Company Stock Option that would have become purchasable upon each future vesting date of such Unvested Company Stock Option, multiplied by (y) the excess (if any) of the Merger Consideration over the exercise price of such Unvested Company Stock Option (the "**Assumed Option Merger Consideration**"). . . . For purposes of clarity, with respect to any Assumed Options held by a non-employee member of the Board of Directors as of the date hereof, as a result of his or her cessation of service as of the Effective Time, the Assumed Option shall immediately vest and such director shall be entitled to be paid the Assumed Option Merger Consideration as soon as reasonably practicable following the Effective Time (but no later than ten (10) Business Days thereafter in any event).

(b) At or immediately prior to the Effective Time, each restricted share unit with respect to Shares granted under a Company Stock Plan, including those units subject to performance criteria (each such unit, whether or not performance-based, a "**Company RSU**"), that is outstanding immediately prior to the Effective Time, whether or not vested, shall be assumed by Parent and converted into an award (an "**Assumed RSU**") representing a right to receive a cash amount equal to the product of (x) the number of Shares that would have been delivered to the holder on each future vesting date of such Company RSU (or on each future delivery date of such Company RSU, if such delivery date is later than the related vesting date), multiplied by (y) the Merger Consideration (the "**Assumed RSU Merger Consideration**"), and such Assumed RSU Merger Consideration shall be payable as soon as practicable after the applicable vesting date or delivery date applicable to the Assumed RSU (but not later than ten (10) Business Days thereafter in any event). . . . For purposes of clarity, with respect to any Assumed RSUs held by a non-employee member of the Board of Directors as of the date hereof, as a result of his or her cessation of

service as of the Effective Time, the Assumed RSU shall immediately vest and such director shall be entitled to be paid the Assumed RSU Merger Consideration as soon as reasonably practicable following the Effective Time (but no later than ten (10) Business Days thereafter in any event).

These benefits are shown in the following chart:

| Name | Number of Accelerating Restricted Stock Units | Number of Vested Options | Number of Accelerating Options | Weighted Average Exercise Price of In-the-Money Options | Cash Consideration for Vested and Accelerating Options and Restricted Stock Units |
|---|---|---|---|---|---|
| **Non-Employee Directors** | | | | | |
| Nelson C. Chan | 19,080 | 38,841 | 5,053 | 7.80 | 539,475.48 |
| Gary S. Guthart, Ph.D. | 15,247 | 116,619 | 5,053 | 6.11 | 1,590,130.76 |
| Jami Dover Nachtsheim | 9,496 | 70,000 | 5,053 | 7.07 | 653,280.39 |
| Riccardo Pigliucci | 7,579 | — | 35,053 | 12.37 | 163,242.39 |
| Merilee Raines | 7,579 | 10,000 | 25,053 | 10.93 | 213,642.39 |
| Robert H. Trice, Ph.D. | 19,080 | 47,778 | 5,053 | 4.20 | 504,802.67 |

99. Accordingly, the Company's directors and officers stand to receive significant benefits and thus have reason to support the Proposed Transaction, which is otherwise against the best interests of the Company's stockholders.

**The Proxy Fails to Disclose Material Information**

100. Compounding the unfair sale process and inadequacy of the Merger Consideration, the Company also filed the materially incomplete and misleading Proxy with the SEC and disseminated it to Affymetrix's stockholders. Designed to convince stockholders, including Plaintiff, to vote in favor of the Proposed Transaction, the Proxy fails to provide the Company's stockholders with critical information. Inexplicably, and as set forth below, the Proxy omits certain information utilized by Morgan Stanley in rendering its fairness opinion – the absence of which is causing a direct harm to Plaintiff in not allowing him to make his own value determination of the Company as a standalone entity

compared to the Merger Consideration.

101.  Specifically, the Proxy omits the following material information (or provides materially misleading information), the absence of which renders Plaintiff unable to make an informed decision as to whether to vote his shares in favor of the Proposed Transaction or seek appraisal.

***Material Omissions Concerning Morgan Stanley's Financial Valuation Analyses***

102.  The Proxy describes Morgan Stanley's fairness opinion and the various valuation analyses it performed in support of its opinion.  However, the description of Morgan Stanley's fairness opinion and analyses fails to include key inputs and assumptions underlying these analyses.   Without this information, as described below, Affymetrix's public stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on Morgan Stanley's fairness opinion in determining whether to vote in favor of the Proposed Transaction.

103.  With respect to Morgan Stanley's *Affymetrix Selected Comparable Companies Analysis*, the Proxy fails to disclose (i) the individual observed metrics and multiples for each of the selected companies, as well as any multiples examined besides 2016 revenue and EBITDA; and (ii) Morgan Stanley's rationale for using adjusted EBITDA for Affymetrix and using unadjusted EBITDA in its calculation of the peer companies' pricing multiples.

104.  With respect to Morgan Stanley's *Affymetrix Discounted Equity Value Analysis*, the Proxy fails to disclose: (i) the individual inputs and assumptions used to arrive at Affymetrix's weighted average cost of capital of 8.7%.

105. With respect to Morgan Stanley's *Select Precedent M&A Transactions Analysis*, the Proxy fails to disclose the individual observed metrics and multiples for each of the selected transactions.

106. With respect to Morgan Stanley's *Affymetrix Discounted Cash Flow Analysis*, the Proxy fails to disclose: (i) the formula or definition for free cash flow and whether Morgan Stanley used levered or unlevered free cash flow; (ii) the basis for the estimated terminal value as well as the corresponding implied terminal multiples if the estimated terminal value was based on an assumed range of growth rates or the corresponding perpetuity growth rates if the estimated terminal value was based on an assumed range of terminal pricing multiples; and (iii) whether the value of Affymetrix's tax assets was considered in any of Morgan Stanley's other analyses.

### *Material Omissions Concerning Management's Financial Projections*

107. The Proxy indicates that Morgan Stanley relied on certain internal projections for fiscal years 2015-2019 in rendering its fairness opinion. However, the Proxy omits the Company's internal projections for the following items: (i) unlevered free cash flows; (ii) reconciliation of GAAP net income to non-GAAP unlevered free cash flows and non-GAAP EBITDA; (iii) net operating loss carryforward balances and utilization; (iv) debt and cash balances; (v) fully diluted share count; (vi) synergies; and (vii) all figures for stub period consisting of the second half of 2014.

108. In addition, the Proxy fails to disclose material information concerning the creation of the projections, including: (i) when in December the Base Case and the Unrisked Upside Case were prepared; (ii) when the Base Case was adjusted; (iii) why the Base Case was prepared; (iv) how the "manner" in which the Unrisked Upside Case was prepared differed from that in

which the Base Case was prepared; and (v) the definition of "free cash flow" and whether it is levered or unlevered.

109.  These material omissions of the best estimates of the Company's financial future must to be remedied prior to the stockholder vote in order to allow Affymetrix stockholders to make a fully informed decision on the Proposed Transaction.

***Material Omissions Concerning the Flawed Sale Process***

110. The Individual Defendants fail to disclose material information relating to, among other things, the sales process leading up to the Proposed Transaction, including:

(a)  Any and all information regarding any discussions that likely took place pertaining to the possible continued employment of Defendant Witney, or any other Affymetrix officers, directors, or employees following a strategic transaction, including but not limited to the timing, content, communications, parties, and form of such an indication.  Given that Thermo Fisher CEO Casper stated: "[w]e're pleased to welcome our new colleagues from Affymetrix to Thermo Fisher," it is likely that discussions regarding continued employment by executives took place;

(b)  Whether the Board considered retaining any other financial advisors and the Board's rationale for engaging Morgan Stanley;

(c)  When the Board was first informed of Morgan Stanley's past and ongoing relationship with Thermo Fisher;

(d)  The pending and potential fees payable to Morgan Stanley by Thermo Fisher for Morgan Stanley's current assignments with Thermo Fisher;

(e)  The Board's basis for failing to reach out to Company A, Company B or Company C prior to entering into exclusivity with Thermo Fisher, particularly in light of the January 26, 2016 proposal bid deadline; and

(f)  The details of any negotiations concerning the deal protection devices, including the 4.23% termination fee.

111.  As a result of the Individual Defendants' breaches of fiduciary duties, Plaintiff will suffer irreparable injury in that he has not and will not receive his fair portion of the value of Affymetrix's assets and business and will be prevented from obtaining the intrinsic value of his equity ownership of the Company.

112.  Unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiff, and may consummate the Proposed Transaction, to the irreparable harm of Plaintiff.

113.  Plaintiff is immediately threatened by the wrongs complained of herein, and lacks an adequate remedy at law.

## CLAIMS FOR RELIEF

## COUNT I

### Violations of §14(a) of the Exchange Act and Rule 14a-9
### (On Behalf of Plaintiff, Individually, Against Affymetrix and All Individual Defendants)

114.  Plaintiff brings this Exchange Act claim on behalf of himself individually.

115.  Plaintiff repeats and realleges all previous allegations as if set forth in full.

116.  Affymetrix and the Individual Defendants have issued the Proxy with the intention of soliciting stockholder approval of the Proposed Transaction.  Affymetrix and each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, among other things, the future value of the Company, certain key inputs and assumptions of the financial analyses performed by Morgan Stanley in support of its fairness opinion, the financial analyses

performed by Morgan Stanley, and the value of certain strategic alternatives that were considered by the Company.

117. In so doing, Defendants made materially incomplete and misleading statements of fact and/or omitted material facts necessary to make the statements therein not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of §14(a).

118. Rule 14a-9, promulgated by the SEC pursuant to §14(a) of the Exchange Act, provides that such communications with stockholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

119. Specifically, and as detailed in paragraphs 100-110 above, the Proxy violated §14(a) and Rule 14a-9 because it omits material facts concerning: (i) the key inputs and assumptions underlying the valuation analyses prepared by Morgan Stanley in connection with the rendering of its fairness opinion in support of the Proposed Transaction; (ii) key projections prepared by Affymetrix; and (iii) material information concerning the sales process leading up to the Proposed Transaction.

120. Moreover, in the exercise of reasonable care, the Individual Defendants knew or should have known that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that Morgan Stanley both reviewed and discussed their financial analyses with the

Board during various meetings, and further states that the Board considered the financial analyses provided by Morgan Stanley as well as Morgan Stanley's fairness opinion and the assumptions made and matters considered in connection therewith.   Affymetrix and the Individual Defendants knew or should have known that the material information identified in paragraphs 100-110 above has been omitted from the Proxy, rendering the sections of the Proxy identified in paragraphs 100-110 materially incomplete and misleading.

121.  The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.  Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

### Violations of §20(a) of the Exchange Act
### (On Behalf of Plaintiff, Individually, Against All Individual Defendants)

122.  Plaintiff brings this Exchange Act claim on behalf of himself individually.

123.  Plaintiff repeats and realleges all previous allegations as if set forth in full.

124. The Individual Defendants acted as controlling persons of Affymetrix within the meaning of §20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Affymetrix, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control, and did

influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

125. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

126. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The omitted information identified above was reviewed by the Board prior to voting on the Proposed Transaction. The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were, thus, directly involved in the making and dissemination of the Proxy.

127. In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

128. By virtue of the foregoing, the Individual Defendants have violated §20(a) of the Exchange Act.

129. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each

violated §14(a) and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of the Individual Defendants' conduct, Plaintiff will be irreparably harmed.

130.  Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' conduct threatens to inflict.

## COUNT III

### Breach of Fiduciary Duties
### (On Behalf of Plaintiff and the Class Against All Individual Defendants)

131.  Plaintiff repeats and realleges all previous allegations as if set forth in full.

132.  The Individual Defendants have violated the fiduciary duties owed to the public stockholders of Affymetrix and have acted to put their personal interests ahead of the interests of Affymetrix stockholders or acquiesced in those actions by fellow Individual Defendants.  The Individual Defendants have failed to take adequate measures to ensure that the interests of Affymetrix's public stockholders are properly protected and have embarked on a process that avoids competitive bidding and provides Thermo Fisher with an unfair advantage by effectively excluding other alternative proposals.

133.  By the acts, transactions, and courses of conduct alleged herein, the Individual Defendants, individually and acting as a part of a common plan, will unfairly deprive Plaintiff and the other members of the Class of the true value of their Affymetrix investment.  Plaintiff and the other members of the Class will suffer irreparable harm unless the actions of these Defendants are enjoined and a fair process is substituted.  These harmful acts include, *inter alia*, agreeing to the unreasonable $55 million termination fee, as well as agreeing to the

restrictive no-solicitation provision, information rights provision, and matching rights provision.

134.  The Individual Defendants have breached their duties of loyalty, good faith, independence and due care by not taking adequate measures to ensure that the interests of Affymetrix's public stockholders are properly protected from overreaching by Thermo Fisher.

135.  By reason of the foregoing acts, practices, and courses of conduct, the Individual Defendants have failed to exercise due care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the other members of the Class.

136.  As a result of the actions of the Individual Defendants, Plaintiff and the Class have been, and will be, irreparably harmed in that they have not, and will not, receive full and fair value for their ownership interest in Affymetrix's stock and businesses.

137.  Plaintiff and the Class have no adequate remedy at law.   Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which these actions threaten to inflict.

## COUNT IV

### Breach of Fiduciary Duty of Disclosure
### (On Behalf of Plaintiff and the Class Against All Individual Defendants)

138.  Plaintiff repeats and realleges all previous allegations as if set forth in full.

139.  The Individual Defendants have caused materially misleading and incomplete information to be disseminated to the Company's public stockholders.  The Individual Defendants have an obligation to be complete and accurate in their disclosures.

140.   The Proxy fails to disclose material information, including financial information and information necessary to prevent the statements contained therein from being misleading.

141.   The misleading omissions and disclosures by Defendants concerning information and analyses presented to and considered by the Board and its advisor affirm the inadequacy of disclosures to the Company's stockholders.   Because of the Defendants' failure to provide full and fair disclosure, Plaintiff and the Class will be stripped of their ability to make an informed decision with respect to the Proposed Transaction, and thus are damaged thereby.

142.   Plaintiff and the members of the Class have no adequate remedy at law.

## COUNT V

### Claim for Equitable Relief
### (On Behalf of Plaintiff and the Class Against All Individual Defendants)

143.   Plaintiff repeats and realleges the previous allegations as if set forth in full.

144.   The Individual Defendants at all times relevant to this Complaint owed a duty not to directly or indirectly deprive Plaintiff and the members of the Class of the statutory remedy of appraisal.

145.   By withholding the critical and material information detailed in paragraphs 100-110, Plaintiff and the members of the Class lacked sufficient information to determine whether to pursue their statutory appraisal rights.

146.   The Individual Defendants also are afforded no protection pursuant to 9 Del. C. §102(b)(7), because that statute only permits a corporation to exculpate directors from monetary liability for breaches of fiduciary duty and

therefore that exculpatory provision does not apply to claims for equitable relief.

147.  Plaintiff and the members of the Class have no adequate remedy at law.

148.  As a result of the Individual Defendants' inequitable conduct, Plaintiff and the members of the Class respectfully requests that the Court exercise its broad discretion and inherent powers of equity to adapt its relief to the particular rights and liabilities of each party and award a remedy of quasi-appraisal.

## COUNT VI

### Claim for Aiding and Abetting
### (On Behalf of Plaintiff and the Class Against Affymetrix, Thermo Fisher and Merger Sub)

149.  Plaintiff repeats and realleges all previous allegations as if set forth in full.

150.  Defendants Affymetrix, Thermo Fisher and Merger Sub are well aware that the Individual Defendants have not sought, and are not seeking, to obtain the best possible transaction for the Company's public stockholders.

151.  Affymetrix, Thermo Fisher and Merger Sub have aided and abetted the Individual Defendants' breaches of fiduciary duties by causing the Board members to accept inadequate consideration for the Company's public stockholders and negotiating unreasonably preclusive deal protection terms.

152.  As a result, Plaintiff and the Class members are being harmed.

153.  Plaintiff and the Class have no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in his favor and in favor of the Class and against Defendants as follows:

A.  Declaring that this action is properly maintainable as a class action as to the counts asserted on behalf of Plaintiff and the Class, and certifying Plaintiff as class representative and Plaintiff's counsel as Class counsel;

B.  Declaring that Affymetrix and the Individual Defendants violated §14(a) of the Exchange Act;

C.  Declaring that the Individual Defendants violated §20(a) of the Exchange Act

D.  Declaring that the Individual Defendants have breached their fiduciary duties to Plaintiff and the Class;

E.  Declaring that Affymetrix, Thermo Fisher and Merger Sub have aided and abetted the Individual Defendants' breaches of their fiduciary duties;

F.  Declaring that the Merger Agreement was entered into in breach of the Individual Defendants' fiduciary duties and is therefore unlawful and unenforceable;

G.  Preliminarily and permanently enjoining Defendants and all those acting in concert with them from consummating the Proposed Transaction until such time that the Individual Defendants have adequately undertaken all appropriate and available methods to obtain a transaction which is in the best interests of Affymetrix's stockholders and remove any conflict of interest that has clouded the process and the Individual Defendants' judgment and Defendants disclose the material information identified above which has been omitted from the Proxy;

H. In the event that the Proposed Transaction is consummated, rescinding the merger, and awarding Plaintiff and the Class compensatory damages and rescissory damages;

I. Awarding Plaintiff the costs and disbursements of this action, including a reasonable allowance for Plaintiff's attorneys' fees, expenses and experts' fees; and

J. Granting such other and further relief as this Court may deem to be just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: March 14, 2016

**WEISSLAW LLP**
Leigh A. Parker

By:  /s/ Leigh A. Parker
Leigh A. Parker
1516 South Bundy Drive, Suite 309
Los Angeles, CA 90025
Telephone:  310/208-2800
Facsimile:  310/209-2348
-and-
Richard A. Acocelli
1500 Broadway, 16th Floor
New York, NY 10036
Telephone: 212/682-3025
Facsimile: 212/682-3010

*Attorneys for Plaintiff Jeffrey S. L. Cheah and the Proposed Class*

COMPLAINT